Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIOVANNI IBARRA, derivatively on behalf of ENPHASE ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> BADRINARAYANAN KOTHANDARAMAN, MANDY YANG, STEVEN J. GOMO, JAMIE HAENGGI, BENJAMIN KORTLANG, JOSEPH MALCHOW, RICHARD MORA, and THURMAN JOHN RODGERS, <br><br> Defendants, <br><br> and <br><br> ENPHASE ENERGY, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Verified Shareholder Derivative Complaint

**INTRODUCTION**

Plaintiff Giovanni Ibarra ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Enphase Energy, Inc. ("Enphase" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Badrinarayanan Kothandaraman ("Kothandaraman"), Mandy Yang ("Yang"), Steven J. Gomo ("Gomo"), Jamie Haenggi ("Haenggi"), Benjamin Kortlang ("Kortlang"), Joseph Malchow ("Malchow"), Richard Mora ("Mora"), and Thurman John Rodgers ("Rodgers") (collectively, the "Individual Defendants," and together with Enphase, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Enphase, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Kothandaraman and Yang for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Enphase, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from December 12, 2022 through April 25, 2023, both dates inclusive (the "Relevant Period").

2.     Enphase is a Delaware corporation located in Freemont, California. It is a global energy technology company that produces microinverters that manage solar generation, storage, and communication on one platform. The microinverters work together with the Company's innovative technology to form a "high-performing clean energy system."

3.     Specifically, the Company designs, develops and manufactures products that provide home energy solutions. This includes solar micro-inverters, battery energy storage, and E.V. charging stations that manage energy generation, energy storage, energy control, and communications on one platform. Additional Company products include microinverter units and related accessories, an I.Q. gateway, I.Q. batteries, and the cloud based Enlighten monitoring service, along with design, proposal, permitting, and lead generation services. Solar distributors, large installers, original equipment manufacturers, strategic partners, and homeowners comprise the Company's customer base.

4.     Throughout the Relevant Period, the Individual Defendants maintained that Enphase's expected revenue for the fiscal year ending December 31, 2023 ("Fiscal Year 2023") would fall between $700 million to $740 million for the first quarter of Fiscal Year 2023 ("Q1 2023").

5.     The Individual Defendants' claims that the Company would increase manufacturing of higher-margin IQ8 microinverters in both Europe and the U.S., roll-out gen-3 battery technology, and enter new markets bolstered their optimistic estimate for Q1 2023 revenue.

6.     However, during the Relevant Period, unbeknownst to investors and the public, the Individual Defendants hid material adverse facts regarding the decline in Company battery shipments to California and Europe, the slowdown in the deployment and adoption of batteries, the extended transition period with NEM (Net Energy Metering) 3.0, and the slower output of inverters manufactured by the new U.S. base manufacturing lines.

Verified Shareholder Derivative Complaint

7.     For instance, on February 7, 2023, prior to the market opening, Enphase issued a press release ("Q4 2022 Press Release") reporting the Company's financial results for the fourth quarter and full year of the fiscal year ending December 31, 2022 ("Q4 2022"), as well as a positive financial outlook for 2023. The press release reported a "quarterly revenue of $724.7 million in the fourth quarter of 2022, along with 43.8% for non-GAAP gross margin" and predicted "revenue to be within a range of $700 million to $740 million, which includes shipments of 100 to 120 megawatt hours of Enphase IQ Batteries" in the upcoming quarter.

8.     Later that same day, the Company held an earnings call to discuss the financial results for Q4 2022 ("Q4 2022 Earnings Call"), in which Defendants Kothandaraman and Yang were present on behalf of the Company. Throughout the call, Defendant Kothandaraman and Defendant Yang touted Enphase's record quarterly revenue for Q1 2023, claiming seasonality and a challenging macro environment did not hinder the Company's increase in sales and revenue.

9.     On April 25, 2023, the truth about Enphase's potential growth in 2023 became known once Enphase issued a press release reporting its Q1 2023 financial results ("Q1 2023 Press Release") and weak revenue forecast for the second quarter of Fiscal Year 2023.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's battery shipments to Europe and California had decreased; (2) Enphase's battery deployment and adoption were experiencing a slowdown; (3) the Company was undergoing a longer transition period with NEM 3.0; and (4) Enphase was experiencing a slower output of inverters manufactured by

the recently-created U.S. base manufacturing lines. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     During the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Enphase to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations and material omissions. Indeed, during the Relevant Period, approximately 148,557 shares of Enphase's common stock were repurchased, costing the Company over $24.4 million. As the Company's stock was actually worth only $163.83, the price at which it was trading when markets closed on April 26, 2023, the Company overpaid for repurchases of its own stock by approximately $114,389 in total.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, one of the Individual Defendants sold shares of Company common stock at inflated prices for combined total proceeds of approximately $965,776.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, the Company's President and Chief Executive Officer ("CEO"), and the Company's Vice President and Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will

have to expend many millions of dollars.

15.   The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.   In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Kothandaraman's, and Defendant Yang's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.   This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.   Venue is proper in this District because Enphase's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in

this District, and Defendants' actions have had an effect in this District.

<u>**PARTIES**</u>

### <u>Plaintiff</u>

21.    Plaintiff is a current shareholder of Enphase. Plaintiff has continuously held Enphase common stock since first purchasing the stock on August 31, 2022.

### <u>Nominal Defendant Enphase</u>

22.    Enphase is a Delaware corporation with its headquarters at 47281 Bayside Parkway, Fremont, California 94538. Enphase's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ENPH."

### <u>Defendant Kothandaraman</u>

23.    Defendant Kothandaraman has served as President and CEO of Enphase and as a Company director since September 2017. Previously, he served as the Company's Chief Operating Officer ("COO") from April 2017 to September 2017. According to the Schedule 14A the Company filed with the SEC on April 4, 2024 (the "2024 Proxy Statement"), as of March 19, 2024, Defendant Kothandaraman beneficially owned 1,584,696 shares of the Company's common stock, representing 1.2% of the Company's total outstanding stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Kothandaraman owned approximately $172,985,415 worth of Enphase stock as of that date.

24.    For Fiscal Year 2023, Defendant Kothandaraman received $19,527,534 in compensation from the Company, including $450,000 in salary, $18,804,672 in stock awards, $270,750 in non-equity incentive plan compensation, and $2,112 in all other compensation.

25.    The 2024 Proxy Statement stated the following about Defendant Kothandaraman:

<u>Key Skills and Qualifications</u>

7

- Mr. Kothandaraman brings to the Board strong technical, operational, strategy and leadership experience during his 21-year career at Cypress Semiconductor and his tenure at Enphase.

Career Highlights

- Mr. Kothandaraman, 52, joined Enphase in April 2017 as Chief Operating Officer ("COO"), before being appointed President and CEO and a member of the Board in September 2017. Prior to Enphase, Mr. Kothandaraman served as Executive Vice President of the Data Communications Division of Cypress Semiconductor Corporation, a semiconductor design and manufacturing company, from April 2011 to September 2016. He started his career with Cypress Semiconductor in 1995 and worked in process technology development and chip design before becoming Vice President of the Asynchronous SRAM Business in 2008. Mr. Kothandaraman was subsequently promoted to executive vice president of Cypress's Data Communications Division in November 2011 and spent the next five years building the USB 3.0, USB-C and the Internet of Things businesses. He also served as the Executive Director of Cypress Semiconductor Technology India Private Limited from 2012 to 2016.

- Mr. Kothandaraman received his bachelor of technology degree from IIT Madras and a master of science degree in materials science from the University of California, Berkeley. Mr. Kothandaraman attended the Stanford Executive Program in 2008 and holds eight U.S. patents.

**Defendant Yang**

26.     Defendant Yang has served as the Company's Vice President and CFO since February 2022. Previously, Defendant Yang served as the Company's Vice President and Chief Accounting Officer from October 2018 to February 2022. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Yang beneficially owned 66,093 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Yang owned approximately $7,214,712 worth of Enphase stock as of that date.

27.     For Fiscal Year 2023, Defendant Yang received $6,656,267 in compensation from the Company. This included $363,125 in salary, $6,111,519 in stock awards, $176,703 in non-equity incentive plan compensation, and $4,920 in all other compensation.

28.    The 2024 Proxy Statement stated the following about Defendant Yang:

Ms. Yang, 48, has served as our Vice President and Chief Accounting Officer from October 2018 until her promotion to our Vice President and CFO in February 2022. Ms. Yang was appointed Executive Vice President in January 2024. Ms. Yang has over 20 years of accounting, financial reporting, treasury, and tax experience. Previously, she was senior director and group controller at Tesla, Inc. from February 2017 to September 2018. Prior to that, she served in various positions at SunPower Corporation, including as Senior Director and Division Controller of the global distributed generation division, and concurrently as the Chief Accounting Officer and Corporate Controller of 8point3 Energy Partners. Before that, she served in a variety of senior finance positions at Spansion Inc. Earlier in her career, Ms. Yang was an internal auditor at SYNNEX Corporation and an auditor with Deloitte & Touche. Ms. Yang earned her bachelor of arts degree in international business from National Taiwan University and a masters of business administration degree in finance and accounting from the University of Illinois at Urbana-Champaign. She is a Certified Public Accountant in California and a Chartered Financial Analyst.

**Defendant Gomo**

29.    Defendant Gomo has served as a Company director since March 2011. He has also served as Chair of the Board since October 2022 and serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Gomo beneficially owned 138,773 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Gomo owned approximately $15,148,460 worth of Enphase stock as of that date.

30.    For Fiscal Year 2023, Defendant Gomo received $374,991 in compensation from the Company. This included $105,000 in fees earned or paid in cash and $269,991 in stock awards.

31.    The 2024 Proxy Statement stated the following about Defendant Gomo:

Key Skills and Qualifications

- Mr. Gomo brings to the Board valuable financial and business expertise through his years of experience as a chief financial officer with publicly

traded companies. Mr. Gomo provides an important role in leading the Board's activities on financial and auditing matters, as well as collaborating with our independent registered public accounting firm and management team in these areas.

Career Highlights

- Mr. Gomo, 72, served as Executive Vice President of Finance and CFO of NetApp Inc., a computer storage and data management company, from October 2004 until December 2011, and as Senior Vice President of Finance and CFO from August 2002 until October 2004. From November 2000 to April 2002, Mr. Gomo served as CFO of Gemplus International S.A., a smart card provider, and from February 1998 until August 2000, Mr. Gomo served as CFO of Silicon Graphics, Inc., a high-performance computer and computer graphics company. Prior to February 1998, Mr. Gomo held various finance, financial management, manufacturing, and general management positions at Hewlett-Packard Company, an information technology company.

- Mr. Gomo holds a bachelor of science degree in business administration from Oregon State University and a master of business administration degree from Santa Clara University.

- From February 2005 to May 2017, Mr. Gomo served on the Board of Directors of SanDisk Corporation, a designer, developer and manufacturer of flash storage solutions. From December 2020 through July 2021, Mr. Gomo served on the Board of Directors of Rodgers Silicon Valley Acquisition Corp, a special purpose acquisition company that successfully completed a business combination with Enovix Corporation.

Current Public Company Boards

- Nutanix, Inc. – since June 2015
- Micron Technology, Inc. – since October 2018

**Defendant Haenggi**

32.     Defendant Haenggi has served as a Company director since August 2020. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Haenggi beneficially owned 7,602 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024

was $109.16, Defendant Haenggi owned approximately $829,834 worth of Enphase stock as of that date.

33.     For Fiscal Year 2023, Defendant Haenggi received $314,852 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $249,852 in stock awards.

34.     The 2024 Proxy Statement stated the following about Defendant Haenggi:

Key Skills and Qualifications

- Ms. Haenggi's extensive experience in consumer and commercial sales, marketing and customer experience brings a valuable perspective to the Board.

Career Highlights

- Ms. Haenggi, 54, has served as the President of ADT Solar, a division of ADT Security Services, a smart-home security provider, since December 2022. She previously served as the Executive Vice President, COO at ADT Solar, overseeing sales, marketing contract center, field and business operations, HR, IT and administration. Prior to that, Ms. Haenggi was the Executive Vice President, Chief Customer Officer at ADT Security Services from July 2018 to March 2022. She joined ADT in 2016 as Senior Vice President, Chief Sales and Marketing Officer and had previously been with the company from 1998 to 2006 with progressive senior leadership roles in commercial sales and marketing, and domestic and international sales and marketing. From 2010 to 2016, Ms. Haenggi was the Chief Customer Experience Officer at Protection 1, Inc., a home security systems company. Previously, she was at Vonage, Inc. from 2006 to 2010 as the Chief Marketing Officer and Vice President of Customer Experience. Earlier in her career, Ms. Haenggi held various sales and marketing roles at Holmes Protection Group and National Guardian Corporation.

- Ms. Haenggi earned a bachelor of arts degree in international relations and Japanese from the University of Minnesota and received an honorary doctorate from Taylor University.

**Defendant Kortlang**

35.     Defendant Kortlang has served as a Company director since May 2010. He also serves as a Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 19,

2024, Defendant Kortlang beneficially owned 209,443 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Kortlang owned approximately $22,862,798 worth of Enphase stock as of that date.

36.    For Fiscal Year 2023, Defendant Kortlang received $334,852 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $249,852 in stock awards.

37.    The 2024 Proxy Statement stated the following about Defendant Kortlang:

Key Skills and Qualifications

- Mr. Kortlang's work as a venture capitalist with a focus on growth-stage investing in alternative energy technologies provides a valuable industry perspective to the Board. Additionally, Mr. Kortlang's investing and business experience also provides the Board with a valuable perspective on acquisitions and building alternative energy businesses.

Career Highlights

- Mr. Kortlang, 48, has been a Partner with G2VP, LLC, a venture capital firm since August 2016. From February 2008 to April 2020, Mr. Kortlang was a Partner with Kleiner Perkins Caufield & Byers, a venture capital firm. From July 2000 to January 2008, Mr. Kortlang worked with Goldman, Sachs & Co., co-heading Goldman's Alternative Energy Investing business. From June 2005 to February 2008, Mr. Kortlang was a Vice President within Goldman's Special Situations Group, before which he was a Vice President in Goldman's investment banking group focusing on Industrials and Natural Resources. From January 1996 to August 1998, Mr. Kortlang was an Associate with A.T. Kearney, Inc., a global management consulting firm where he focused on strategic and operations consulting in the energy, manufacturing, packaging, transportation and communications industries. From February 1993 to July 1994, Mr. Kortlang was a Business Analyst at National Australia Bank in strategic planning and macroeconomic forecasting. Mr. Kortlang served on the Board of Directors of Luminar Technologies, Inc. from 2019 until 2021.

- Mr. Kortlang holds a bachelor of business degree in economics and finance from Royal Melbourne Institute of Technology, a bachelor of commerce and an honors degree in econometrics from University of Melbourne and

a master of business administration degree from the University of Michigan.

**Defendant Malchow**

38.    Defendant Malchow has served as a Company director since February 2020. He previously served as a consultant to Enphase from April 2019 to April 2022. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Malchow beneficially owned 56,616 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Malchow owned approximately $6,180,203 worth of Enphase stock as of that date.

39.    For Fiscal Year 2023, Defendant Malchow received $309,852 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $249,852 in stock awards.

40.    The 2024 Proxy Statement stated the following about Defendant Malchow:

Key Skills and Qualifications

- Mr. Malchow brings to the Board many years of entrepreneurial and investment experience, with expertise in scaled infrastructure, software-driven businesses, data security and machine learning.

Career Highlights

- Mr. Malchow, 38, has served as the founding Partner at HNVR Technology Investment Management, a venture capital firm, and has been investing in technology companies since 2013. In 2011, he co-founded Publir LLC, a cloud software company. Mr. Malchow is a member of the board of the National Civic Arts Society in Washington, D.C. From December 2020 through July 2021, he served on the Board of Directors of Rodgers Silicon Valley Acquisition Corp, a special purpose acquisition company that successfully completed a business combination with Enovix Corporation, a lithium-ion battery company. From January 2021 to January 2023, Mr. Malchow served on the Board of Directors of Archaea Energy Inc., a leading producer of renewable gas. Mr. Malchow provided consulting services to Enphase from April 2019 until April 2022. Mr. Malchow is also involved with Stanford University's Freeman-Spogli

Institute and Hoover Institution, and with The Federalist Society in Washington, D.C.

- Mr. Malchow holds a bachelor of arts degree from Dartmouth College and a juris doctorate degree from Stanford University.

Current Public Company Boards

- Enovix Corporation (formerly Rodgers Silicon Valley Acquisition Corp.) - since June 2023

**Defendant Mora**

41.    Defendant Mora has served as a Company director since February 2014. He also serves as a member of the Compensation Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Mora beneficially owned 3,126 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Mora owned approximately $341,234 worth of Enphase's stock as of that date.

42.    For Fiscal Year 2023, Defendant Mora received $334,852 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $249,852 in stock awards.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mora made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 3, 2023 | 4,500 | $214.62 | $965,776 |

Thus, in total, before the fraud was exposed, he sold 4,500 shares of Company common stock on inside information, for which she received approximately $965,776 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

44.     The 2024 Proxy Statement stated the following about Defendant Mora:

<u>Key Skills and Qualifications</u>

- Mr. Mora's expertise in process and productivity improvements at the corporate, regional and country level provides a valuable perspective to the Board, as well as his years of experience with respect to emerging companies, risk management, team building and international operations.

<u>Career Highlights</u>

- Mr. Mora, 59, served as the CEO of Landis+Gyr, an energy management company, from April 2017 through April 2020. Prior to that, Mr. Mora served as the COO of Landis+Gyr, from January 2014 to April 2017. Mr. Mora served as the President and CEO of Landis+Gyr Americas where he had responsibilities for operations in both North and South America, from August 2011 to January 2014. He served as the President and CEO of Landis+Gyr North America, from August 2008 to August 2011.

- Mr. Mora holds a bachelor of arts degree in economics from Stanford University

**Defendant Rodgers**

45.     Defendant Rodgers has served as a Company director since January 2017. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Rodgers beneficially owned 2,398,251 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Rodgers owned approximately $261,793,079 worth of Enphase stock as of that date.

46.     For Fiscal Year 2023, Defendant Rodgers received $334,852 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $249,852 in stock awards.

47.     The 2024 Proxy Statement stated the following about Defendant Rodgers:

<u>Key Skills and Qualifications</u>

- Mr. Rodger's brings 35 years of public company CEO experience to the Board. Mr. Rodgers provides an important role in leading the strategic vision of the company.

Career Highlights

- Mr. Rodgers, 76, founded Cypress Semiconductor Corporation in 1982 and served as the President, CEO and as a member of the Board of Directors until April 2017. From September 2020 to July 2021, he served as the Chairman of the Board of Directors and CEO of Rodgers Silicon Valley Acquisition Corp., a special purpose acquisition company, that successfully completed a business combination with Enovix Corporation in July 2021, and he continues to serve as the Chairman of the Board of Directors of Enovix Corporation. From January 2017 to January 2023, Mr. Rodgers also served on the Board of Directors of FTC Solar, Inc., a solar tracker company. From May 2002 to May 2011, Mr. Rodgers served as a member of the Board of Directors of SunPower Corporation, an energy company. From June 2004 through December 2012 Mr. Rodgers was a member of the board of trustees of Dartmouth College.

- Mr. Rodgers holds a bachelor of science degree in physics and chemistry from Dartmouth. Mr. Rodgers holds a master of science degree and a Ph.D. in electrical engineering from Stanford University. At Stanford, Mr. Rodgers invented, developed and patented VMOS technology.

Current Public Company Boards
- Enovix Corporation (formerly Rodgers Silicon Valley Acquisition Corp.) - since September 2020
- Complete Solaria - since November 2022

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.    By reason of their positions as officers, directors, and/or fiduciaries of Enphase and because of their ability to control the business and corporate affairs of Enphase, the Individual Defendants owed Enphase and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Enphase in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Enphase and its shareholders so as to benefit all shareholders equally.

49.     Each director and officer of the Company owes to Enphase and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Enphase, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers and directors of Enphase were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Enphase, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

53.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business,

products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Enphase were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Enphase's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Enphase conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Enphase and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Enphase's operations would comply with all applicable laws and Enphase's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

        (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

        (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.    Each of the Individual Defendants further owed to Enphase and the shareholders the duty of loyalty requiring that each favor Enphase's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Enphase and were at all times acting within the course and scope of such agency.

57.    Because of their advisory, executive, managerial, directorial, and controlling positions with Enphase, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by

Enphase.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Enphase was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants

acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Enphase and was at all times acting within the course and scope of such agency.

## ENPHASE'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Enphase's Code of Conduct*

64.    Enphase's Code of Conduct (the "Code of Conduct") represents that it applies to all of Enphase's and its subsidiaries' employees, directors, and officers, (collectively "Enphase Representatives"), as well as to suppliers, vendors, consultants and business partners (collectively, "Enphase Suppliers") of Enphase and its subsidiaries.

65.    The Code of Conduct states that the Company aims to "conduct business with integrity and to follow ethical and legal business practices worldwide."

66.    Under the heading "Compliance with Laws, Rules, and Regulations," the Code of Conduct states:

> Enphase Representatives must respect and obey the laws of the cities, states and countries in which Enphase operates. Enphase Representatives should strive to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and should seek advice from managers or other appropriate individuals in case of any uncertainty. Violation of laws, rules and regulations may subject you, as well as Enphase, to civil and criminal penalties. Each Enphase Supplier must respect, obey and comply with the laws applicable to its business activities.

67.    In a section titled "Accurate Financial Records," the Code of Conduct states, in relevant part:

> Enphase's financial records must be accurate and complete in all material respects. They must be in compliance with laws and accounting practices. The

Finance department is responsible for preparing and reporting Enphase's financial results, but those financial statements are the result of activities, transactions, entries and documents prepared throughout Enphase by many people. Enphase Representatives must make sure all such supporting transactions and documents are complete, accurate, and truthful. Enphase Suppliers will use commercially reasonably efforts to assist Enphase with its compliance objectives under this section. No Enphase Representative or Enphase Supplier may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the Securities and Exchange Commission ("SEC"), and other laws, rules and regulations, or take any action to fraudulently induce, coerce, manipulate or mislead the Finance department or our independent auditors. No Enphase Representative or Enphase Supplier should knowingly allow Enphase to make any false or misleading statement or omit information necessary to make any of Enphase's statements and reports accurate.

68.     Enphase addresses "Insider Trading" within the Code of Conduct in detail, stating:

All material non-public information about Enphase, our vendors, business partners and customers should be considered confidential, and Enphase Representatives and Enphase Suppliers who have access to such information should use it only for legitimate Enphase business. The use of any material, non-public information to buy stock, or "tip" others, is unethical and illegal.

69.     Under the section titled "Avoid Conflicts of Interest" the Code of Conduct addresses disclosures of conflicts of interest, stating:

A "conflict of interest" exists when a person's private interest interferes in any way with the interests of Enphase. Conflicts of interest may arise when an Enphase Representative, or a member of their family, receives improper personal benefits as a result of their position with Enphase. A conflict of interest can also arise when an Enphase Representative takes actions or has interests that make it difficult to perform their work objectively and effectively. Conflicts of interest are prohibited, unless specially approved by the Compliance Officer. If you have any questions about a potential conflict of interest or if you become aware of an actual or potential conflict of interest, you should discuss the matter with your manager, HR or Legal. Managers may not authorize conflicts of interest or make determinations as to whether a problematic conflict of interest exists without first seeking the approval of the

Compliance Officer. If your manager is involved in the potential or actual conflict of interest, you should contact HR, Legal, or use the Whistleblower Hotline. Any conflict of interest situation involving an executive officer or director, including all loans and guarantees by Enphase involving persons covered by this Code, also requires the authorization of the Audit Committee of the Board of Directors ("Audit Committee").

70.     The Code of Conduct addresses Confidentiality under the heading, "Confidential Information," stating:

Much of the information to which Enphase Representatives have access to at Enphase is confidential, privileged, or proprietary. Such information should not be disclosed to individuals outside of Enphase, except where required for company-related business and covered by the terms of a Nondisclosure Agreement with the receiving individual or entity. In the course of serving our customers, Enphase Representatives may also learn confidential or proprietary information about them, and it is equally important that Enphase Representatives guard against the disclosure of their confidential information to others. Competitive information must be gathered with care, and not be acquired in ways that are unethical or illegal.

71.     The Code of Conduct addresses Company assets under the heading, "Use of Company Assets and Technological Resources" stating, in relevant part:

All Enphase Representatives and Enphase Suppliers (to the extent applicable) are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability. Although reasonable personal use of computer equipment is allowed, as a general rule all Enphase property, facilities and products, are expected to be used only for legitimate business purposes.

72.     Under the section titled "Approvals or Waivers," the Code of Conduct states:

Any approval of conduct prohibited by this Code or any waiver of provisions of this Code requires approval of the Compliance Officer. With respect to Enphase's executive officers or directors, any such approval or waiver also requires authorization by the Audit Committee and may also require public disclosure under SEC rules.

### *Enphase's Corporate Governance Guidelines*

73.     The Company also maintains Corporate Governance Guidelines (the

"Governance Guidelines"). Under the section titled "Role of the Board of Directors" the Governance Guidelines state:

> The Board is selected by the stockholders to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Service on the Board requires significant time and attention on the part of directors. More specifically, the Board has responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing the Company and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of the Company. Directors must participate in Board meetings, review relevant materials, serve on committees and prepare for meetings and discussions with management. Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask relevant, incisive and probing questions and require honest and accurate answers. Directors must act with integrity and are expected to demonstrate a commitment to the Company, its values and its business and to long-term stockholder value. Directors are encouraged to attend the Company's annual meeting of stockholders, either in person or telephonically.

74.    The Governance Guidelines outline the functions of each committee within the section titled "Board Committees." Under the sub-heading "Committee Functions" the Governance Guidelines include information regarding the Audit Committee, stating the following, in relevant part:

> **Audit Committee**. The Audit Committee oversees the Company's corporate accounting and financial reporting process. For this purpose, the Audit Committee performs several functions. The Audit Committee evaluates the performance of and assesses the qualifications of the independent auditors; determines and approves the scope of the engagement and compensation of the independent auditors; determines whether to retain or terminate the existing independent auditors or to appoint and engage new independent auditors; reviews and approves the retention of the independent auditors to perform any proposed permissible non-audit services; monitors the rotation of partners of the independent auditors on the Company's audit engagement team as required by law; confers with management and the independent

auditors regarding the effectiveness of internal controls over financial reporting; establishes procedures, as required under applicable law, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters; reviews the financial statements to be included in the Company's Annual Report on Form 10-K; and discusses with management and the independent auditors the results of the annual audit and the results of the Company's quarterly financial statements.

75.     Under the same sub-heading, the Governance Guidelines specifically address the function of the Compensation Committee, stating the following:

The Compensation Committee reviews and approves the overall compensation strategy and policies for the Company. The Compensation Committee reviews and approves corporate performance goals and objectives relevant to the compensation of the Company's executive officers and other senior management; reviews and approves or recommends to the Board for approval the compensation and other terms of employment of the Company's Chief Executive Officer; reviews and approves or recommends to the Board for approval the compensation and other terms of employment of the other executive officers and senior members of management; and administers the Company's equity incentive and stock purchase plans, pension and profit sharing plans, stock bonus plans, deferred compensation plans and other similar programs.

76.     Within the same section, but under the sub-heading "Committee Charters," the Governance Guidelines specifically address committee accountability, stating, in relevant part:

All standing committees will operate pursuant to a written charter, which sets forth the responsibilities of the committee and procedures that the committee will follow. Unless otherwise directed by the Board, new committees formed by the Board will develop a written charter delineating its responsibilities.

77.     The Governance Guidelines discuss director confidentiality compliance under the heading "Board Member Compliance with Confidentiality Obligations" stating, in relevant part:

Delaware law imposes duties of care and loyalty on corporate directors, which includes a duty to protect the confidential information of the Company. In addition, the duty of loyalty prohibits directors from using any proprietary information belonging to the Company for their own personal benefit or the benefit of any person or entity other than the Company. It is essential that directors maintain the confidentiality of all nonpublic information belonging to, entrusted to, or about the Company.

After consulting with the Chief Legal Officer, directors may disclose information covered by confidentiality obligations to the extent authorized by the Chairman of the Board or the CEO or as required by law or legal process. All disclosures of non-public information must either (A) be disclosures subject to a confidentiality agreement and that satisfy the SEC's Regulation FD or (B) public disclosures managed in accordance with the Company's communication protocols.

78.     Under the heading, "Chief Executive Officer Evaluation; Succession Planning" the Governance Guidelines state, in relevant part:

The Board should conduct an annual review of the Chief Executive Officer's performance. The evaluation should be based on objective criteria including performance of the business, accomplishment of long-term strategic objectives and the development of management. The evaluation will be used by the Compensation Committee and Board in the course of its deliberations when considering the compensation of the Chief Executive Officer.

79.     In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $965,776. Also, in violation of the Governance Guidelines, the Individual Defendants failed to maintain the accuracy of Enphase's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct

business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### *Enphase's Audit Committee Charter*

80.    Enphase also maintains a Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter") which governs the Audit Committee's roles, responsibilities, and states the following regarding the purpose of the Audit Committee:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Enphase Energy, Inc., a Delaware corporation (the "Company"), shall be to (i) monitor and/or assist the Board in monitoring and overseeing (a) the audit, compliance, accounting and financial reporting procedures of the Company, (b) the adequacy of the Company's internal financial controls, and (c) the overall integrity of the Company's financial statements; and (ii) monitor and oversee (x) the selection and independence of the Company's independent registered public accounting firm ("independent auditors") and (y) the management of risks associated with the Company's financial reporting, accounting and auditing matters.

> The Committee's function is primarily one of oversight and shall not relieve the responsibilities of the Company's management for preparing financial statements, which accurately and fairly present the Company's financial results and condition, or the responsibilities of the independent auditors relating to the audit or review of financial statements. Nothing in this charter is intended to preclude or impair the protection provided in Section 141(e) of the Delaware General Corporation Law ("DGCL") for good faith reliance by members of the Committee on reports or other information provided by others.

81.    Under the section titled "Annual Financial Reporting" the Audit Committee Charter outlines the responsibilities and duties of the Audit Committee, stating the following, in relevant part:

> In connection with the audit of each fiscal year's financial statements, the Committee will:

> •    meet with representatives of the independent auditor prior to the audit to review planning and staffing of the audit;

---

- review and discuss the audited financial statements and related accounting and auditing principles and practices with appropriate members of the Company's management;

*                    *                    *

- review with appropriate management and auditor representatives their analysis of significant matters which relate to (1) the selection, application and effects of critical accounting policies applied by the Company, (2) internal auditing, financial management and control personnel, systems and procedures, (3) the status of any new, proposed or alternative accounting or financial reporting requirements, and (4) issues raised by any management letter from the auditors, difficulties encountered in the audit, disagreements with management, or other significant aspects of the audit;

- receive from the independent auditors a written disclosure and statement of all relationships between the auditors and the Company consistent with Rule 3526 of the PCAOB; • discuss with the auditors any disclosed relationships or services that may impact the objectivity or independence of the auditors and take, or recommend that the full Board take, appropriate action to oversee the independence of the auditor;

- obtain from the independent auditors a statement of the audit fees and other categories of fees billed for the last fiscal year which are required to be disclosed in the Company's proxy statement for its annual meeting under the SEC's proxy rules, and consider whether the provision of any non-audit services is compatible with maintaining the auditors' independence;

*                    *                    *

- recommend whether or not the audited financial statements should be included in the Company's Annual Report on Form l0-K for filing with the SEC.

82.    Under the section titled "Quarterly Financial Reporting" the Audit Committee Charter delineates the Committee's review of interim financial results, stating:

At a Committee meeting or through the Committee chairperson, the Committee will review with the independent auditors and appropriate Company officers the Company's interim financial results to be included in the Company's earnings press releases and on each Form 10-Q. The Committee's review will normally include:

- the results of the independent auditors' review of the quarterly financial statements;

- management's analysis of any significant accounting issues, changes, estimates, judgments or extraordinary items relating to the financial statements; and

- the selection, application and effects of critical accounting policies applied by the Company.

83.     Regarding internal controls, the Audit Committee Charter states:

The Committee will review at least annually:

- internal control systems and procedures of the Company; the status of management responses to the prior period audit management letter by the independent auditors;

- succession planning and staffing levels for the Company's finance and accounting employees;

- the status and implementation of conduct codes concerning related-party transactions within the meaning of Rule 4-08(k) of Regulation S-X, conflicts of interest, ethical conduct, and compliance with applicable laws and regulatory policies; and

- if the Company has an internal audit function, the internal audit function's responsibilities, budget, and staffing.

84.     Regarding earnings announcements, the Audit Committee Charter states, "The Committee will review and discuss with management and the Auditors any earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies. The Chairperson of the Committee may represent the entire Committee for the purposes of this discussion."

85.     In a section titled "Risk Assessment and Management," the Audit Committee Charter states, "The Committee will review and discuss with management and, as appropriate, the auditors the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures."

86.     In addition, the Audit Committee Charter outlines other committee

responsibilities under the heading "Other Committee Review Function" stating, in relevant part, that "The Committee will establish and oversee procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters."

87.     In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.     Enphase is a Delaware corporation located in Freemont, California. Enphase is a global energy technology company that advertises innovative, convenient solutions for managing solar generation, storage, and communication on a singular platform.

89.     Enphase designs, develops, and manufactures products that provide home energy solutions, including solar micro-inverters, battery energy storage, and E.V. charging stations that manage energy generation, energy storage, energy control, and communications on one platform.

90.     Additional Company products include microinverter units and related accessories; an I.Q. gateway; I.Q. batteries; and the cloud-based Enlighten monitoring

service, along with design, proposal, permitting, and lead generation services. Company customers include solar distributors, large installers, original equipment manufacturers, strategic partners, and homeowners.

## FALSE AND MISLEADING STATEMENTS

### December 12, 2022 Announcement

91.    On December 12, 2022, the Company announced that it was expanding its microinverter business in Florida, stating the following, in relevant part:

FREMONT, Calif., Dec. 12, 2022 (GLOBE NEWSWIRE) -- Enphase Energy, Inc. (NASDAQ: ENPH), a global energy technology company and the world's leading supplier of microinverter-based solar and battery systems, announced today that installers of Enphase® products in Florida have seen growing deployments of Enphase Energy Systems™ powered by IQ8™ Microinverters. ***Residential solar deployments in Florida have grown substantially over the last several years and are expected to reach more than 500 MW by the end of 2022, according to the most recent U.S. Solar Market Insight report from Wood Mackenzie and the Solar Energy Industries Association. Additionally, deployments of residential battery capacity in Florida are expected to grow more than four-fold by the end of 2026, according to the most recent U.S. Energy Storage Monitor report from the Energy Storage Association and Wood Mackenzie.*** "Enphase's IQ8 Microinverters are unlocking more energy independence for our customers than ever before," said Matt Selby, president at Unicity Solar. ***"We're excited to grow our business by offering Enphase's industry-leading products and services to homeowners across Florida."*** […]

(Emphasis added).

92.    The bolded and italicized portions of these statements were materially false and misleading because they failed to disclose that higher interest rates were already adversely affecting Enphase, particularly in Florida.

### January 5, 2023 Announcement

93.    On January 5, 2023, the Company announced that it was also expanding its microinverter business in Arizona, stating the following, in relevant part:

FREMONT, Calif., Jan. 05, 2023 (GLOBE NEWSWIRE) -- Enphase Energy, Inc. (NASDAQ: ENPH), a global energy technology company and the

world's leading supplier of microinverter-based solar and battery systems, announced today that *installers of Enphase® products in Arizona have seen growing deployments of Enphase Energy Systems™ powered by IQ8™ Microinverters.*

*According to the U.S. Solar Market Insight report from Wood Mackenzie and the Solar Energy Industries Association, residential solar deployments in Arizona have been growing year-over-year and are forecasted to reach 206 MW in 2023, representing a 20 percent increase over the previous year. Additionally, residential battery deployments in Arizona are expected to nearly quadruple by the end of 2026, according to the most recent U.S. Energy Storage Monitor report from the Energy Storage Association and Wood Mackenzie.*

"Arizona homeowners and businesses are increasingly turning to solar power to keep their electricity bills under control as power prices continue to rise," said Chad Waits, owner at Net Zero Solar, an Enphase Platinum level installer. "With a shared passion for clean energy, quality, value, and customer service, we're proud to partner with Enphase to offer the IQ8- powered Enphase Energy System to our customers." "We believe that our customers are the center of our universe and that is why we are proud to provide them with access to the industry-leading IQ8 microinverters from Enphase," said Caleb Antonucci, chief executive officer at Our World Energy, an Enphase Gold level installer. "This cutting-edge technology helps Arizona homeowners gain access to clean energy, so they can feel good about doing their part to make the world a better, greener place. We are committed to helping Arizona homeowners harness the power of clean energy and make the most of their unique needs." […]

(Emphasis added).

94.    The bolded and italicized statements were materially false and misleading when made because Defendants failed to disclose that higher interest rates were already adversely affecting Enphase, including in Arizona.

**February 7, 2023 Q4 2022 Press Release**

95.    On February 7, 2023, during pre-market hours, Enphase issued a press release reporting the Company's financial results for the fourth quarter and full-year 2022 and providing the Company's financial outlook for the first quarter of Fiscal Year 2023. The

press release stated the following, in relevant part:

> We reported record quarterly revenue of $724.7 million in the fourth quarter of 2022, along with 43.8% for non-GAAP gross margin. We shipped 4,873,702 microinverters, or approximately 1,952.4 megawatts DC, and 122.1 megawatt hours of Enphase® IQ™ Batteries. Financial highlights for the fourth quarter of 2022 are listed below:
>
> - Record quarterly revenue of $724.7 million
> - GAAP gross margin of 42.9%; non-GAAP gross margin of 43.8%
> - GAAP operating income of $157.0 million; non-GAAP operating income of $229.4 million
> - GAAP net income of $153.8 million; non-GAAP net income of $212.4 million
> - GAAP diluted earnings per share of $1.06; non-GAAP diluted earnings per share of $1.51
> - Free cash flow of $237.3 million; ending cash, cash equivalents, and marketable securities of $1.61 billion
>
> \*          \*          \*
>
> ***IQ8 Microinverters constituted approximately 55% of all our microinverter shipments during the fourth quarter of 2022.*** We introduced IQ8 Microinverters in France and the Netherlands in the fourth quarter of 2022, marking the first expansion into international markets for the product since its successful launch in North America in late 2021.
>
> ***Our IQ Battery shipments were 122.1 megawatt hours in the fourth quarter of 2022, compared to 133.6 megawatt hours in the third quarter of 2022. We made significant software upgrades to continue improving the installer and homeowner experience and brought commissioning times down. We shipped IQ Batteries to North America, Germany, and Belgium during the fourth quarter of 2022. We now have approximately 2,300 installers worldwide that are certified to install our IQ Batteries.***
>
> We are adding additional manufacturing capacity in the United States due to the strong global demand for our products as well as the incentives related to the Inflation Reduction Act (IRA). We plan to begin domestic manufacturing in the second quarter of 2023 with a new contract manufacturing partner and in the second half of 2023 with our two existing contract manufacturing

partners.

We began manufacturing Enphase-branded electric vehicle (EV) chargers at our contract manufacturing facility in Mexico, helping us to increase capacity and reduce costs. We expect to introduce IQ smart EV chargers to customers in the United States in the first half of 2023. They will provide connectivity and control, enabling use cases like green charging and allowing homeowners visibility into the operation of their Enphase solar-plus-storage-plus-EV system through the Enphase® App.

We continued to make progress on our installer platform. We made updates to Solargraf℠ software during the fourth quarter of 2022, incorporating battery design and proposal, document management, consumption modeling, and several other improvements requested by our installer partners. In addition, we made significant strides in automating the creation of permit plan sets with Solargraf software. We now have more than 1,000 installers using the software.

\* \* \*

**FIRST QUARTER 2023 FINANCIAL OUTLOOK**

For the first quarter of 2023, Enphase Energy estimates both GAAP and non-GAAP financial results as follows:
- Revenue to be within a range of $700 million to $740 million, which includes shipment of 100 to 120 megawatt hours of Enphase IQ Batteries
- GAAP gross margin to be within a range of 40.0% to 43.0%; non-GAAP gross margin to be within a range of 41.0% to 44.0%, excluding stock-based compensation expense and acquisition related amortization

***February 7, 2023 Q4 2022 Earnings Call***

96.    Later that same day, Enphase held its Q4 2022 Earnings Call.  During the call, Defendant Kothandaraman and Defendant Yang discussed detailed information regarding Enphase's increased manufacturing in Europe and the U.S., continued ramp in higher margin IQ8 microinverters, launch of the Company's gen-3 battery technology, increased market presence, and the development of U.S. manufacturing lines.

97.    At the start of the Q4 2022 Earnings Call Defendant Kothandaraman stated

the following, in relevant part:

> Let's talk about microinverter manufacturing. Our overall supply environment remains quite stable in general. There are issues that crop up from time to time. Our teams are staying on top of them. Our quarterly capacity was 5 million microinverters exiting Q4. We are on track to begin manufacturing at Flex Romania starting this quarter, enabling us to service Europe better. This will enable a total quarterly capacity of 6 million microinverters exiting Q1. We are going to increase this capacity even more with U.S. manufacturing.

> Let's cover that now. As we discussed last quarter, we are pleased that the IRA will help bring back high-tech manufacturing to the U.S. and stimulate the economy through the creation of jobs. We are excited to service the U.S. customers better with local manufacturing. We plan to begin U.S. manufacturing of our microinverters in the second quarter of 2023 with a new contract manufacturing partner and in the second half of 2023 with our 2 existing contract manufacturing partners. We plan to open 6 manufacturing lines by the end of this year adding a quarterly capacity of 4.5 million microinverters, bringing our total quarterly capacity to more than 10 million microinverters as we exit 2023.

> \*        \*        \*

> ***Let's cover the regions. Our U.S. and international revenue mix for Q4 was 71% and 29%, respectively. In the U.S., our revenue increased 15% sequentially and 59% year-on-year. We had record quarterly revenue, record quarterly sell-through for our microinverters and record quarterly installer count in the fourth quarter. Our microinverter channel inventory was quite healthy at the end of the fourth quarter, while our storage channel inventory was a little elevated.***

> \*        \*        \*

> ***We have a strong team in place and are quite bullish about 2023. We expect to introduce IQ batteries and IQ8 microinverters into many more countries in Europe as we progress through the year. Our value proposition is our differentiated home energy management systems, combined with high quality and great customer experience.***

(Emphasis added.)

98.     During the Q4 2022 Earnings Call, Defendant Yang touted the Company's increased revenue in Q4 2022 and provided a positive business outlook for the first quarter of 2023, stating, in relevant part:

**Total revenue for Q4 was $724.7 million, representing an increase of 14% sequentially and a quarterly record. We ship approximately 1,952.4 megawatts DC of microinverters and 122.1 megawatt hours of IQ batteries in the quarter. Non-debt gross margin for Q4 was 43.8% compared to 42.9% in Q3.**

The increase was driven by a favorable I8 product mix. The gross margin was 42.9% for Q4. Non-GAAP operating expenses were $87.7 million for Q4 compared to $78.6 million for Q3. The increase was driven by international growth, customer service and R&D. Same operating expenses were $153.7 million for Q4 compared to $132.5 million for Q3. GAAP operating expenses for Q4 included $59.4 million of stock-based compensation expenses and $4.9 million of acquisition-related expenses and amortization for acquired intangible assets and $1.8 million of restructuring and asset impairment charges.

*          *          *

In Q4, we generated $253.7 million in cash flow from operations and $237.3 million in free cash flow. Capital expenditure was $16.4 million for Q4 compared to $8.9 million for Q3. The increase was primarily due to investment in additional content manufacturing sites and R&D equipment. Capital expenditure for the full year of 2022 was $46.4 million. Now let's discuss our outlook for the first quarter of 2023. We spent our revenue for the first quarter of 2023 to be within a range of $700 million to $740 million, which includes shipments of 100- to 120-megawatt hours of IQ batteries. We expect GAAP gross margin to be within the range of 40% to 43% and non-debt gross margin to be within the range of 41% to 44%, which excludes stock based compensation expenses and acquisition-related amortization. We assume a conservative euro FX rate in our Q1 guidance, and we don't expect significant impact to our financials from fluctuations in FX rates. We set up our debt operating expenses to be within a range of $177 million to $181 million, including approximately $77 million estimated for stock-based compensation expenses, restructuring charges for site consolidation, acquisition-related expenses and amortization. We expect our non-GAAP operating expenses to be within a range of $100 million to $104 million.

(Emphasis added.)

99.     Defendant Kothandaraman echoed Defendant Yang's optimistic sentiment regarding the Company's opportunities for Fiscal Year 2023 stating, in relevant part:

We manage for the long term. The basic thesis ongoing solar and storage remains intact, aided by a few factors: first, the utility rates which are rising in many states across the U.S.; second, the 30% ITC tax credit, which has been extended for 10 years with the IRA; and third, the desire for energy independence and tackling climate change.

At Enphase, we will continue to make best-in-class home energy systems with a laser focus on product innovation, quality and customer experience. Let's switch to talking about battery. We shipped 122-megawatt hours of IQ batteries in Q4. We have now certified approximately 2,300 installers worldwide since the introduction of IQ batteries into North America, Germany and Belgium. Our installers in North America experienced a median commissioning time of 91 minutes exiting Q4 compared to 118 in Q3. We made significant software changes to improve communication, big transitions and commissioning time, and I'm quite happy with the performance of the team.

As a result, we saw slightly higher sell-through of our batteries in Q4 versus Q3. We've also got a number of feedback from the installers about the fact of improved performance in terms of commissioning. We plan to ship 100- to 120- megawatt hours of IQ batteries in Q1. We also expect to start ramping our third generation IQ battery in North America and Australia in the second quarter. This battery has got 5-kilowatt hour modularity, 2x the power compared to our existing battery and 30-minute commissioning time in addition to being easier to install and service. We expect the higher charge discharge rate as well as the 5-kilowatt hour modularity to be uniquely beneficial to the homeowners under the upcoming NEM 3.0 tariff in California.

With the significant changes we are making to our IQ batteries, we are confident that storage installations will become as efficient as microinverters. And as a result, the profitability for installers should get better. We expect our battery business to perform well in the second half of the year, both due to our third-generation battery as well as NEM 3 adoption in California.

*        *        *

*In summary, we are quite pleased with our performance. As a reminder, our strategy is to build best-in-class home energy systems and deliver them to homeowners through our installer and distributor partners, enabled by the installer platform. We have many new products that are coming out in 2023, that will increase our served available market and positively contribute to the top line.*

*We look forward to introducing IQ8 microinverters worldwide, introducing IQ batteries into more countries in Europe, launching our third-generation battery in North America and Australia as well as introducing our highest power 480- watt IQ8P microinverter for both the U.S. small commercial and emerging residential markets. We're also excited about the upcoming Solargraf functionality, especially the NEM 3.0 functionality. And finally, the work we are doing to bring both smart EV chargers as well as bidirectional EV charging capabilities to the market.*

(Emphasis added.)

100.    Throughout the question-and-answer portion of the Q4 2022 Earnings Call, Defendant Kothandaraman continuously assured investors that he was optimistic about Enphase's growth in 2023, responding to an analyst inquiring about the upcoming quarter by stating the following, in relevant part:

<Q: Mark Wesley Strouse – JP Morgan Chase & Co. – Analyst> So a lot of focus on the U.S. markets, but I just wanted to go back to your comments about Europe. So that's obviously been very strong in the last couple of years, kind of doubling each year. *I know you don't guide annually, but just kind of how should we think about that market in 2023?* Do you think kind of an approximate doubling is kind of the base case that we should be expecting from here?

<A: Badrinarayanan Kothandaraman> Well, as you said, we do not drive something annually, but European market is growing. At least our internal reports talk about served available solar market of about 13 gigawatts, 1-3, in 2023. The markets to really -- the markets that are really driving are Netherlands, Germany, Spain, France, Italy, and even actually Austria, Poland, et cetera. They're all becoming quite significant markets. In addition,

attach -- battery attach is also growing. Like what I stated in the prior question -- answering the prior question, the attach rate on batteries in Germany is 80%. So solar plus storage is growing healthily. And the geopolitical situation accelerated it last year, and that's continuing what do -- what's our position is. We have a very differentiated product. We have microinverters on the roof, which are very high quality, easy to install, we have a huge customer service operation there in France and in Germany, and we take care of customers well.

\*     \*     \*

**So to answer your question, the market is growing. The market is growing really significantly. That's what I told you 13 gigawatts, we are well positioned due to our differentiating value proposition, and we recently bought a company, GreenCom Networks that is even going to make that situation better where we provide a complete home energy management system to our installers**.

\*     \*     \*

<Q: Steven Isaac Fleishman – Wolfe Research, LLC – Analyst> Yes. Just you're growing your production capacity, you're doubling it from $5 million a quarter to $10 million. You said, I think, by year end of '20 -- '23. **Just could you give us a sense of your conviction that the demand will be there to meet that doubling of production.**

<A: Badrinarayanan Kothandaraman> Yes. Look, if you look at our past growth rates, you can see it, we grew from -- we grew, I think, '21 to '22, we grew 59%. And at that time, I think end of '21, we were doing, if I remember right, around 3- ish million units a quarter. End of '22, we are now -- we just reported 5-ish million units a quarter. **So you can see that that's the nice growth. So, our long-term thesis on solar is -- we are extremely bullish. We -- especially with countries like Europe and with a strong position in the U.S. with our rapid entry into other emerging markets. We think it is the right call to basically invest in the right manufacturing, especially given the IRA benefits. So even if we don't use all 10 million units per quarter, we will use it sooner or later. And I think the ROI is well worth especially considering the net benefit to us. So our logic was quite simple.**

**We weren't worried. We did a few back-of-the-envelope calculations. We thought it is the right thing for us to invest in these lines and fortunately,**

*we have very strong and great contract manufacturing partners who need to do a lot of the heavy lifting, all our capital that we set out is quite limited. They do a lot of the heavy lifting, like what they are doing today, and 2 of them are existing contract manufacturers. So we have deep relationships. And we are going to work with them in the long term. So we thought that's the right decision for us to do, and we basically accelerated that effort.*

*And once we make a decision, it takes us a few quarters. In the past, it has taken us 4 to 6 quarters to ramp up the likes. So our thesis is quite bullish on solar, and we think that's the right call.*

(Emphasis added.)

101.   When another analyst asked Defendant Kothandaraman about the NEM (Net Energy Metering) 3.0 system's effect on Enphase's solar products, he responded the following:

<Q: Brian K. Lee – Goldman Sachs Group, Inc. – Analyst> … First question I had was just around NEM 3.0. I think there's different implications of that policy uncertainty near term and medium term from what we're hearing. So maybe just wanted to get your thoughts near term, some views out there that maybe there's a pull forward on demand in California. Would be curious what you're seeing with respect to that? And then kind of in the medium term, we're hearing the industry is still maybe trying to figure out how to navigate this. So curious how you specifically are thinking about the second half of 2023 in the U.S.? Are you kind of base case in California to be down significantly? And then how do you see yourself navigating that, if that's the case? Are you driving more product to other states, focusing more in Europe? Just curious just how you'd be thinking about planning into that period of higher policy uncertainty in the back half?

<A: Badrinarayanan Kothandaraman> *Yes. On NEM 3, we aren't really seeing any pull forward right now. But in talks with few installers in California, both big and small, like what I said, the originations are up strongly. They are all quite optimistic. And maybe we will see something soon that's why I talked about an optimistic Q2. But so far, we haven't seen any pull forward demand yet.*

*Now on talking about NEM 3.0 in general. NEM 3.0 is going to be incredibly positive for us.* Because NEM 3.0, I mean, just so everybody gets

it, I'll talk about NEM 3.0, the features of NEM 3.0. Basically, the -- previously, the import and export rates were the same. So therefore, when you exported electrons with the solar system didn't really matter. As long as you exported, it got directly subtracted from what you import. That's why it's called net metering, and that was net metering 2.0. With NEM 3.0, it matters when you export these electrons. So you have 24 hours a day, 365 days a year. So basically, 8,760 data points, and there is an export rate for each of those data points. Each of those hours, there is an export rate. And -- but what it works out to be is if you are interested in a pure solar system, your payback dropped understandably from, let's say, 5 years, it increases actually to something like 7 or 7.5 years with the pure solar system.

*        *        *

**I'm not sure whether California will go in that direction. Time will tell because, we do have some color. We do have resilience issues as well. But I'm sure markets will evolve a little in that direction, too. So bottom line, we are incredibly optimistic. We got the right batteries for it with the third-generation battery. We got the modularity, which I think will start becoming popular.** Grid-tied may become popular, but we'll be ready to do either grid tied or off grid, on grid with backup. The things that are looking, we like NEM 3.0. Of course, we didn't like the fact the step down happened right away. But I think in the long term, it's an okay decision.

(Emphasis added.)

102.   The statements contained in ¶¶95-101 above were materially false and/or misleading when made because they failed to disclose that: (1) the Company's battery shipments to Europe and California had decreased; (2) Enphase's battery deployment and adoption were experiencing a slowdown; (3) the Company was undergoing a longer transition period with NEM 3.0; and (4) Enphase was experiencing a slower output of inverters manufactured by the recently-created U.S. base manufacturing lines. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

   ***April 6, 2023 Proxy Statement***

103.   On April 6, 2023, the Company filed a proxy statement with the SEC on Schedule 14A (the "2023 Proxy Statement"). Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

104.   The 2023 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) elect Defendants Haenggi, Kortlang, and Mora to the Board until the 2026 annual meeting of stockholders; (2) approve, on an advisory basis, executive compensation; and (3) ratify the selection of Deloitte & Toche LLP as the Company's independent registered public accounting firm for Fiscal Year 2023.

105.   With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated:

> We have adopted the Enphase Energy Code of Conduct ("Code of Conduct") that applies to all officers, directors and employees. The Code of Conduct is available on our website at *https://investor.enphase.com/corporate-governance*. If we make any substantive amendments to the Code of Conduct or grant any waiver from a provision of the Code of Conduct to any executive officer or director, we intend to promptly disclose the nature of the amendment or waiver on our website.

106.   Regarding the Role of the Board of Directors in Risk Oversight, the 2023 Proxy Statement stated:

> One of the Board's key functions is informed oversight of our risk management process. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, the Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for Enphase. The Audit Committee has the responsibility to consider and discuss our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and

management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. The Audit Committee responsibilities also include oversight of cybersecurity risk management through its oversight of our controls and procedures in the finance and accounting areas. This oversight also includes an annual review of our IT security. The Nominating and Corporate Governance Committee oversees the risks associated with Board governance, director independence and our human capital and sustainability initiatives. The Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Each of our committees provides reports to the full Board on their oversight activities and elevates review of risk issues to the Board as appropriate. In addition, the Board meets with certain members of our executive team, including the heads of our different organizational functions, who discuss the risks and exposures involved in their respective areas of responsibility as well as any developments that could impact our risk profile or other aspects of our business. These reports from our executive team are designed to provide timely visibility to the Board and its committees about the identification and assessment of key risks, our risk mitigation strategies and ongoing developments.

107.   With regard to the Audit Committee's oversight responsibility, the 2023 Proxy Statement stated:

The Audit Committee also has the following responsibilities:
- determining whether to retain or terminate the existing independent auditors or to appoint and engage new independent auditors;
- reviewing and approving the retention of the independent auditors to perform any proposed permissible non-audit services;
- reviewing and approving or rejecting related-party transactions;
- oversight of our enterprise risk management program; and
- reviewing and discussing with management and the independent registered public accounting firm our annual audited and quarterly financial statements, the results of the independent audit and the quarterly reviews, and the reports and certifications regarding internal control over financial reporting and disclosure controls.

Verified Shareholder Derivative Complaint

108.   Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's battery shipments to Europe and California had decreased; (2) Enphase's battery deployment and adoption were experiencing a slowdown; (3) the Company was undergoing a longer transition period with NEM 3.0; and (4) Enphase was experiencing a slower output of inverters manufactured by the recently-created U.S. base manufacturing lines. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

109.   The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

110.   As a result of Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Haenggi, Kortlang, and Mora to the Board until 2026 annual meeting of stockholders; (2) approve, on an advisory basis, executive compensation; and (3) ratify the selection of Deloitte & Toche LLP as the Company's independent registered public accounting firm for Fiscal Year 2023.

### The Truth Emerges

*April 25, 2023 Q1 2023 Press Release*

111.   On April 25, 2023, the truth about Enphase's financial results for Q1 2023 began to emerge when the Company issued a press release reporting its Q1 2023 results

and weak revenue outlook for the second quarter of Fiscal Year 2023. The Q1 2023 Press Release revealed the following, in relevant part:

> Total revenue for the first quarter of 2023 was $726.0 million, compared to $724.7 million in the fourth quarter of 2022. Our revenue in the United States for the first quarter of 2023 decreased approximately 9% due to seasonality and macroeconomic conditions, while our revenue in Europe increased approximately 25%, compared to the fourth quarter of 2022. Our non-GAAP gross margin was 45.7% in the first quarter of 2023, compared to 43.8% in the fourth quarter of 2022, driven by increased IQ8™ product mix and improved logistics.
>
> For the second quarter of 2023, Enphase Energy estimates both GAAP and non-GAAP financial results as follows, excluding any benefit from the IRA:
> • Revenue to be within a range of $700.0 million to $750.0 million, which includes shipments of 80 to 100 megawatt hours of Enphase IQ Batteries
> • GAAP gross margin to be within a range of 41.0% to 44.0%
> • Non-GAAP gross margin to be within a range of 42.0% to 45.0%, excluding stock-based compensation expense and acquisition related amortization
> • GAAP operating expenses to be within a range of $155.0 million to $159.0 million
> • Non-GAAP operating expenses to be within a range of $98.0 million to $102.0 million, excluding $57.0 million estimated for stock-based compensation expense, acquisition related expenses and amortization, and restructuring charges for site consolidation
> • GAAP and non-GAAP annualized effective tax rate is expected to be within a range of 21.0% to 23.0%

(Emphasis added.)

### *April 25, 2023 Q1 2023 Earnings Call*

112.   The truth fully emerged later that day when the Company hosted an earnings call (the "Q1 2023 Earnings Call") following the Q1 2023 Press Release. During the call, Defendant Kothandaraman and Defendant Yang provided insight on the Company's Q1 2023 financial results, as well as a poor revenue forecast for the second quarter of Fiscal Year 2023, stating the following, in relevant part:

We had a decent quarter. We reported revenue of $726 million, shipped approximately 4.8 million microinverters and 102-megawatt hours of batteries and generated free cash flow of $223.8 million. Approximately 65% of our Q1 microinverter shipments were IQ8. We exited Q1 at 46% gross margin, 14% operating expense and 32% operating income, all as a percentage of revenue on a non-GAAP basis.

\*       \*       \*

***In the U.S., our revenue decreased 9% sequentially due to seasonality and macroeconomic conditions and increased 28% year-on-year. The sell-through of our microinverters in Q1 decreased 21% sequentially compared to Q4, worse than the typical seasonality of 15%. Our microinverter channel inventory at the end of Q1 was relatively normal, while the storage channel inventory was a little elevated.***

\*       \*       \*

As I said earlier on this call, our sell-through of microinverters in the U.S. was 21% lesser in Q1 compared to Q4. Our sell-through in California was only 9% lesser than Q4. There was some impact due to the weather in early Q1, but the NEM 2.0 rush in Q1 more than compensated for it.

California installers took advantage of the NEM 2.0 rush and have built up a solar backlog for the next 3 to 4 months. We believe the installers aren't expanding their crews to accelerate installation, they're laser focused on their cash flow due to the high interest rate environment and are looking clarity -- for -- yes, clarity on the NEM 3.0 demand.

Sell-through of our batteries in California was 23% lesser in Q1 compared to Q4 as installers focused mainly on solar. We expect this trend to continue for the next 3 to 4 months. After that, we see NEM 3.0 as a net positive for California and expect strong demand to resume for solar plus storage. Let's cover the rest of the U.S. The sell-through of microinverters in non-California states was 25% lesser in Q1 compared to Q4.

We observed that the sell-through was even lower in states with low utility rates, such as Texas, Florida and Arizona. In these states, the economics of loan financing has worsened due to rising interest rates. The sell-through performance in the Northeast U.S. was a little better. Coming to IQ batteries,

Verified Shareholder Derivative Complaint

the sell-through in non-California states was 28% lesser in Q1 compared to Q4.

(Emphasis added.)

113.   Throughout the Q1 2023 Earnings Call, analysts and investors asked Defendant Kothandaraman and Defendant Yang several questions related to the Company's financial results for Q1 2023.

114.   Specifically, analyst Mark Wesley Strouse at JP Morgan Chase & Co. asked the following question about guidance regarding the second quarter of Fiscal Year 2023:

> So I'll just stick to one and take the rest offline. I wanted to come back to the OpEx. The guidance for 2Q is kind of flattish quarter-over-quarter. Just from a high level, not necessarily looking for specific guidance, but from a high level, I mean, to the extent that the macro continues to deteriorate, California transition might take longer than expected. How should we think about OpEx going forward and kind of balancing near-term profitability with a lot of the investments that you're making in geographic and product expansion and everything else?

Defendant Kothandaraman replied:

> You should always think about OpEx at 15% of sales. That's the general model. All I said in Q2 that we're not going to be compromising on innovation. We're not going to be compromising our international growth. We're going to make generally the company better in other areas. But our baseline is 15% of revenue, and we don't plan on exceeding that.

*        *        *

115.   A different analyst, Christine Cho, from Barclays Bank PLC inquired into the Company's expected IQ8 rollout percentage, asking, in relevant part:

> Okay. And then on the IQ8 rollout, that's been slower than expected. Could you just go into some more detail into what's driving that? Is it on the supply side with any of the components? Or is it on the demand side as customers sound like they've had to work through inventory over the last quarter or 2? And I think on the last quarter call, you said you expected it to jump to 80% in 2Q.

So is that still the expectation? And then just with the gross margins, it's very high this quarter and the IQ8 drove that. But your 2Q guidance is lower and batteries are lower. So that's going to be less of a drag. So is this just conservatism? Or is there anything one-off that we should be aware about in 1Q or 2Q?

Defendant Kothandaraman replied:

There's nothing one-off. You're right, we are -- originally, I thought 90% by Q2, last earnings call, I told you 90% by Q3. That's the number, 90% by Q3. 80% by Q2 will be okay. We are -- for example, in Europe, 50% of our volumes are IQ8 right now. We're introducing IQ8 to many more countries as we speak. Yesterday, we introduced IQ8 to Spain and Portugal. Soon, we will introduce to Poland, Germany, et cetera. We plan on doing the bulk of those introductions. In this quarter, most of them, there will be some spillover in Q3 for a few, but we very much want to achieve 90% in Q3. That's our target.

116.   Later on the call, analyst Eric Andrew from Stine-Craig-Hallum Capital Group asked Defendant Kothandaraman to provide insight as to what conditions would allow the Company to reach the high end of its predicted revenue range, as opposed to what conditions would risk the Company falling within the lower end of the revenue range, asking, in relevant part:

One here at the end for me. So I know a lot of moving parts, you've got a big revenue range on one hand, less seasonality on the other. Channel inventory that you've detailed, I'm just curious if you'd be willing to kind of go through a scenario that gets you to the high end of that revenue range and a scenario that gets you to the low end of that range and maybe how that breaks down between the U.S. and international?

Defendant Kothandaraman replied:

Yes. I mean we are pretty conservative when it comes to our guidance. You should see our track record in general. And we do have -- like what I said, we do have a lot of dry powder in terms of new products. This year is the year of new products, and we are going to be releasing new products constantly. And so we think other than the base business, which we guided on in Q2, there is a lot more to come there.

So our guidance is a little bit wider this time, plus/minus $25 million. It is to reflect a slightly more uncertainty compared to the last time. But our Europe business is doing incredibly well. We grew 25% in one quarter from Q4 to Q1. We have doubled -- we doubled from 2020 to 2021. From '21 to '22, we grew 132%. I just released my annual letter yesterday. You can see that. 132% growth from '21 to '22. And so Europe is doing incredibly well for us. We are focused on entering a lot more countries there. We are focused on IQ8 microinverters. We're focused on IQ batteries. Lots of regions big market over 10 gigawatts compared to the U.S., which is 5 gigawatts right now. So bottom line, we are pretty conservative.

Analyst Eric Andrew from Stine-Craig-Hallum Capital Group responded:

Got it. And then I mean you do have the wide range, but it did seem in your commentary that you do expect improvement versus the first quarter. I mean, so is it fair to say that your expectation would be that the top half of that range?

Defendant Kothandaraman replied:

I mean we gave guidance, $700 million to $750 million. And there's nothing else, we cannot say we are in the top half of the range.

117.   Defendant Kothandaraman and Defendant Yang's above referenced statements from the Q1 2023 Press Release and Q1 2023 Earnings Call sharply cut against the statements made by both Defendants during the Q4 2022 Earnings Call. During the Q4 2022 Earnings Call, Defendant Kothandaraman discussed the Company's plans to increase manufacturing of IQ8 microinverters in both Europe and the U.S., introduce gen-3 battery technology, increase market presence, and begin developing U.S. manufacturing lines. Defendant Kothandaraman and Defendant Yang also emphasized the Company's ability to experience record quarterly revenue for Q1 2023 in spite of seasonality and macroeconomic challenges.

118.   On this news, the price of the Company's stock fell from $220.60 per share on April 25, 2023, to $163.83 per share on April 26, 2023. This represented a decline of almost 26% within one day.

119.   Multiple reputable financial analysts lowered their price targets for the Company following the news. For instance, Wells Fargo's price target for Enphase's stock dropped, with Wells Fargo analysts noting that "[t]he revenue outlook for the next 1-2 Qs is uncertain due to NEM 3.0, higher interest rates & elevated storage inventories. However, estimates have already been cut to reflect much of these headwinds."

120.   Additionally, Deutsche Bank also lowered its price target for Enphase stock, reporting that "[t]he guide implies flat revenues sequentially, despite management expecting better seasonality in 2Q vs 1Q." The Deutsche Bank analyst also noted the low probability of the Company's new U.S. base manufacturing lines being fully operational by the end of the year and commented that the Company's expectation of shipment capacity reaching 4.5 m units by the end of 2024 was "a slower assumption vs. previous commentary."

### Repurchases During the Relevant Period

121.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $24.45 million to repurchase approximately 148,557 shares of its own common stock at artificially inflated prices from December 2022 through April 2023.

122.   According to a Form 10-Q the Company filed with the SEC on July 27, 2023, in April 2023,[1] the Company purchased 148,557 shares of its common stock for approximately $24.45 million at an average price of $164.60 per share.

123.   As the Company's stock was actually worth only $163.83 per share, the price at closing on April 26, 2023, the Company overpaid by approximately $114,389 for repurchases of its own stock in April 2023.

124.   Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $114,389.

---

[1] Upon information and belief, these shares were repurchased during the Relevant Period.

**DAMAGES TO ENPHASE**

125.   As a direct and proximate result of the Individual Defendants' conduct, Enphase has lost and will continue to lose and expend many millions of dollars.

126.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129.   Such losses include the Company's overpayment of approximately $114,389 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

130.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

131.   As a direct and proximate result of the Individual Defendants' conduct, Enphase has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

132.   Plaintiff brings this action derivatively and for the benefit of Enphase to

redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Enphase, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Kothandaraman and Yang.

133.   Enphase is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.   Plaintiff is, and has been at all relevant times, a shareholder of Enphase. Plaintiff will adequately and fairly represent the interests of Enphase in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

135.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

136.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Enphase's Board consisted of the following seven individuals: Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

137.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by approximately $114,389 for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators

Verified Shareholder Derivative Complaint

of the scheme.

138.   Moreover, all of the Director-Defendants solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Haenggi, Kortlang, and Mora to the Board, thus allowing them to continue breaching their fiduciary duties to Enphase.

139.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Enphase to issue materially false and misleading statements. Specifically, the Director-Defendants caused Enphase to issue false and misleading statements which were intended to make Enphase appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

140.   Additional reasons that demand on Defendant Kothandaraman is futile follow. Defendant Kothandaraman has served as President and CEO of Enphase and as a Company director since September 2017. Previously, he served as the Company's COO from April 2017 to September 2017. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and influential member of the Board, Defendant Kothandaraman was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period. The Company provides Defendant Kothandaraman with his principal occupation, for which he receives handsome compensation, including over $19 million for Fiscal Year 2023. Defendant Kothandaraman also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Haenggi, Kortlang, and Mora to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to

monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Kothandaraman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Gomo is futile follow. Defendant Gomo has served as a Company director since March 2011. He also serves as Chair of the Board and as Chair of the Audit Committee. Defendant Gomo has received and continues to receive handsome compensation for his role as a director, including $374,991 in Fiscal Year 2023. Defendant Gomo also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Haenggi, Kortlang, and Mora to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As trusted Chair of the Board and Chair of the Audit Committee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Gomo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

142. Additional reasons that demand on Defendant Haenggi is futile follow. Defendant Haenggi has served as a Company director since August 2020. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Haenggi has received and continues to receive handsome compensation for her role as a director, including $314,852 in Fiscal Year 2023. Defendant Haenggi also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to her re-election to the Board, as well as the re-elections of Defendants Kortlang and Mora to the

Board, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Haenggi breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

143.   Additional reasons that demand on Defendant Kortlang is futile follow. Defendant Kortlang has served as a Company director since May 2010. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Kortlang has received and continues to receive handsome compensation for his role as a director, including $334,852 in Fiscal Year 2023. Defendant Kortlang also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to his re-election to the Board, as well as the re-elections of Defendants Haenggi and Mora to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Kortlang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

144.   Additional reasons that demand on Defendant Malchow is futile follow. Defendant Malchow has served as a Company director since February 2020. He also previously served as a consultant to Enphase from April 2019 to April 2022. Thus, as the Company admits, he is a non-independent director. Defendant Malchow has received and

continues to receive handsome compensation for his role as a director, including $309,852 in Fiscal Year 2023. Defendant Malchow also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Haenggi, Kortlang, and Mora to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Malchow breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

145. Additional reasons that demand on Defendant Mora is futile follow. Defendant Mora has served as a Company director since February 2014. He also serves as a member of the Compensation Committee and Audit Committee. Defendant Mora has received and continues to receive handsome compensation for his role as a director, including $334,852 in Fiscal Year 2023. Defendant Mora also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to his re-election to the Board, as well as the re-elections of Defendants Haenggi and Kortlang to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, during the Relevant Period and while the price of the Company's common stock was artificially inflated due to the misrepresentations alleged herein, Defendant Mora engaged in lucrative insider trading, obtaining personal profits of approximately $965,776. For these reasons too, Defendant Mora breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon him is futile and therefore, excused.

146.    Additional reasons that demand on Defendant Rodgers is futile follow. Defendant Rodgers has served as a Company director since January 2017. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Rodgers has received and continues to receive handsome compensation for his role as a director, including $334,852 in Fiscal Year 2023. Defendant Rodgers also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Haenggi, Kortlang, and Mora to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Rodgers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

147.    Additional reasons that demand on the Board is futile follow.

148.    Each of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $114,389 for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

149.    Defendants Gomo, Kortlang, and Mora (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such,

they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

150.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

151.   Enphase has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Enphase any part of the damages Enphase suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

152.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

153.   The acts complained of herein constitute violations of fiduciary duties owed by Enphase's officers and directors, and these acts are incapable of ratification.

154.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Enphase. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Enphase, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

155.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Enphase to sue the Individual Defendants named herein, since,

if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

156.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

157.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

159.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

160.   Defendants Haenggi, Kortlang, Mora, Kothandaraman, Malchow, Gomo, and Rodgers caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's battery shipments to Europe and California had decreased; (2) Enphase's battery deployment and adoption were experiencing a slowdown;

(3) the Company was undergoing a longer transition period with NEM 3.0; and (4) Enphase was experiencing a slower output of inverters manufactured by the recently-created U.S. base manufacturing lines. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

161.    Under the direction and watch of Defendants Haenggi, Kortlang, Mora, Kothandaraman, Malchow, Gomo, and Rodgers, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

162.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to the election of the Company's directors.

163.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders reelected  Defendants Haenggi, Kortlang, and Mora to the Board, thereby allowing them to continue breaching their fiduciary duties to Enphase.

164.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

165.    Plaintiff, on behalf of Enphase, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a)**
**of the Exchange Act**

166.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.   The Individual Defendants, by virtue of their positions with Enphase and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Enphase and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Enphase to engage in the illegal conduct and practices complained of herein.

168.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## **THIRD CLAIM**
### **Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

169.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Enphase. Not only is Enphase now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Enphase by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase ***more than 148,000*** of its own shares at artificially inflated prices, damaging Enphase.

171.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and practiced in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

172.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Enphase not misleading.

173.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Enphase.

174.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

175.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

176.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

177.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Enphase's business and

affairs.

179.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

180.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Enphase.

181.    In breach of their fiduciary duties owed to Enphase, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's battery shipments to Europe and California had decreased; (2) Enphase's battery deployment and adoption were experiencing a slowdown; (3) the Company was undergoing a longer transition period with NEM 3.0; and (4) Enphase was experiencing a slower output of inverters manufactured by the recently-created U.S. base manufacturing lines. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

182.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

183.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $965,776.

184.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

185.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Enphase's securities.

186.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Enphase's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

187.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

188.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Enphase has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

190.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Enphase.

192.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Enphase that was tied to the performance or artificially inflated valuation of Enphase, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

193.   Plaintiff, as a shareholder and a representative of Enphase, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

194.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

195.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Enphase, for which they are legally responsible.

197.   As a direct and proximate result of the Individual Defendants' abuse of control, Enphase has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

199.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Enphase in a manner consistent with the operations of a publicly held corporation.

201.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Enphase has sustained and will continue to sustain significant damages.

202.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

203.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

204.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

206.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Enphase to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust

the Company and its products.

207.   In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

208.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

209.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Kothandaraman and Yang for Contribution Under Sections 10(b) and 21D of the Exchange Act

210.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.   Enphase and Defendants Kothandaraman and Yang are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Kothandaraman's and Defendant Yang's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

212.   Defendants Kothandaraman and Yang, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

213.   Accordingly, Defendants Kothandaraman and Yang are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

214.   As such, Enphase is entitled to receive all appropriate contribution or

indemnification from Defendants Kothandaraman and Yang.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Enphase, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Enphase;

(c)     Determining and awarding to Enphase the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Enphase and the Individual Defendants to take all necessary actions to reform and improve Enphase's corporate governance and internal procedures to comply with applicable laws and to protect Enphase and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Enphase to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Enphase restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 16, 2024                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

Docusign Envelope ID: 9C0DABC7-5A36-4F5B-A9EE-1A66D2B4699C

## **VERIFICATION**

I, Giovanni Ibarra, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15__ day of July, 2024.

DocuSigned by:

_____
3EB003302E08742E...
Giovanni Ibarra